UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TRAVELERS CASUALTY AND,
SURETY COMPANY, as Assignee
and Equitable Subrogee of
BBC INTERNATIONAL, LTD.,

        Plaintiff,

v.                               CASE No.: 8:03-CV-2548-T-23TGW

CITIBANK (SOUTH DAKOTA), N.A.,

        Defendant.

_____

REPORT AND RECOMMENDATION

        In this case, a former employee of the plaintiff's insured embezzled corporate funds by misappropriating checks totaling over $123,000, to pay personal debt she and her husband accumulated on the defendant's credit cards. The plaintiff argues that the defendant is liable for the loss because it failed to inquire about the validity of the checks prior to cashing them. It asserts claims of negligence, conversion, unjust enrichment, and a statutory violation.

The defendant seeks summary judgment on all of the plaintiff's claims, arguing that it is  a holder in due course of the checks, and, as such, it negotiated the checks free of any claims by the plaintiff.  In addition, it contends that none of the plaintiff's claims are cognizable.  The defendant has failed to show that it is entitled to summary judgment on the issues of holder in due course and negligence.  However, the plaintiff has not established that its claims of conversion, unjust enrichment, or the alleged Florida statutory violation are viable.  I therefore recommend that the motion be granted in part and denied in part.

I.

Plaintiff Travelers Casualty and Surety Company is a subrogee of BBC International LLC, a designer of footwear.  Dianne Rodriguez is a former BBC employee who worked in BBC's accounts payable department. She embezzled BBC funds to pay personal debt on her and her husband's AT&T Universal credit cards, which are owned and issued by defendant Citibank.

During the period from December 2000 until May 2002, Rodriguez embezzled forty BBC checks and made them payable to "AT&T," "AT&T Uni," or "AT&T Universal" (see Doc. 29, p. 58, Ex. 4).  BBC was not

indebted to the AT&T Universal credit card, but during the relevant time period BBC was using AT&T for its long distance telephone service (id. at p. 50).   Rodriguez would present to BBC management actual AT&T long distance invoices and sometimes would present the same invoice on multiple occasions for payment approval (id. at p. 60).[1]  Proceeding under the belief that the payments were for long distance telephone service, BBC management approved the issuance of the checks, and the checks were duly executed by two of BBC's authorized signatories, neither of whom was Rodriguez (id. at pp. 56-57, 84-85; Doc. 26, pp. 19-21; Doc. 27, pp. 36-39).

　　　　To insure that the checks were delivered to the defendant, Rodriguez changed the vendor address in the BBC computer system so that the address printed on the AT&T checks, and that which appeared in the window of the payment envelope, reflected the defendant's payment processing center (see Doc. 29, pp. 56-57, Ex. 6).  After the checks were signed, Rodriguez handwrote her, or her husband's, AT&T Universal card

---

[1]In fact, only a portion of the checks were sent to pay the AT&T long distance bill. Consequently, many of BBC's monthly statements from AT&T reflected that a balance, sometimes several thousands of dollars, was owed (see, e.g., Doc. 29, Ex. 7).  Charles Messner, BBC's comptroller, stated that BBC was aware of these discrepancies, and allegedly brought them to Rodriguez's attention for resolution (Doc. 29, pp. 5, 18). Rodriguez allegedly told Messner that AT&T had failed to credit the account and that she was working on resolving the problem (id. at p. 59).

account number on the check stub to signal the account to which the proceeds were to be applied (Doc. 27, pp. 40-41, 87). Rodriguez did not, however, include with any of the payments the payment coupon that accompanies the monthly statements (id. at p. 87).

When the defendant received the checks, it credited the proceeds to the AT&T Universal credit card account of Rodriguez or her husband in accordance with the handwritten account number. The defendant typically processes the payments using an automated system that reads information from the bar codes printed on the check and payment coupon (see Doc. 40, pp. 44, 46-47). However, since Rodriguez did not include the payment coupon with the payment, each check was handled manually (see id.). This circumstance required the clerk to identify the appropriate account number and review the check for possible fraudulent activity in accordance with the defendant's fraud review policies (see Doc. 46, pp. 19-20, 26, Ex. A, Citi 300-07).

In this case, most of the BBC checks met one or more of the defendant's possible fraud criteria. For example, a check equal to, or greater than $1,000, without an accompanying payment coupon, could be a possible fraud indicator (Doc. 46, pp. 20-21, 29, 48, Ex. A, Citi 304, 305).

Consequently, the clerk would be directed to check other possible fraud indicators, such as whether the surname on the check matches the account holder's information (see, e.g., id. at pp. 48-50, Ex. A, Citi 303-04).  Here, where the names of the drawer of the check and the account holder did not match and there were other fraud indicators, the first BBC check was referred to the CREW (credit fraud early warning) department for further review (see id. at pp. 71-74, Ex. A, Citi 303-04).  However, the defendant's procedures required the CREW department in this circumstance only to contact the drawer's bank to confirm that there were sufficient funds to cover the amount of the check, and, since there were, the check was returned to normal processing (id. at pp. 55, 74).

Furthermore, subsequent BBC checks exceeding $1,000 seemingly were not forwarded to the CREW department because, if the drawer had paid on the account more than twenty days prior without return of the payment, the check was considered low risk (id. at pp. 105-07, Ex. A, Citi 303).  Thus, the defendant did not contact BBC with respect to any of the BBC checks to determine whether the defendant was authorized to apply corporate funds to the Rodriguez credit card accounts.

Rodriguez procured forty BBC checks totaling $123,222.38 that were credited to her or her husband's AT&T Universal Card accounts (Doc. 2, ¶28).[2]  BBC did not object to the payment of any of these checks because it was unaware that it was paying both its AT&T long distance accounts and the personal credit card accounts of Rodriguez and her husband.  BBC finally discovered the theft in August 2002 while negotiating with AT&T a new long-distance telephone service contract (see Doc. 28, pp. 22-32; Doc. 29, p. 89, Exs. 9, 12).

Rodriguez was subsequently prosecuted for, and pled guilty to, grand theft.  She has been ordered to pay restitution (Doc. 27, Ex. 8; Doc. 29, Ex. 12).  BBC filed a claim with its insurer, the plaintiff, under an insurance policy protecting it against employee dishonesty.  The plaintiff compensated BBC for its loss, and BBC assigned its rights regarding this matter to the plaintiff (Doc. 2, ¶¶ 11, 12).

This lawsuit followed.  The plaintiff insurance company, as assignee and subrogee of its insured, filed a four-count complaint against the defendant under theories of unjust enrichment, conversion, "failure to exercise

---

[2]Rodriguez also misdirected BBC checks to Jaguar for a car lease and to BellSouth for payment of her personal cellular telephone bill (Doc. 27, p. 75; Doc. 29, Exs. 13, 15).

ordinary care," and violations of §§ 673.3061 and 673.3071, Fla. Stat. (id.).[3] The basis of the plaintiff's claims is that, before accepting BBC's checks, the defendant allegedly had a duty to inquire into the authority of Rodriguez and her husband to receive the proceeds of those checks (id. at ¶9).

The defendant has filed a motion for summary judgment (Doc. 30), arguing that it is entitled to judgment as a matter of law on all of the plaintiff's claims because it is a holder in due course of the checks, which would permit it to negotiate the checks free of any of the plaintiff's claims. Further, the defendant contends that "a credit card issuer does not owe a duty to investigate whether authentic, unaltered checks, which identify a valid credit card account number and are mailed to the credit card payment processing center, were actually intended by the corporate payor to pay the identified credit card account" (Doc. 31, p. 1). Moreover, it alleges that the plaintiff's other claims are not cognizable in these circumstances because the defendant was not unjustly enriched, and the checks do not constitute property that can be converted under common law (id. at pp. 17-19). In a statement of

---

[3] The plaintiff withdrew at the pretrial conference the statutory claim under §673.3071, Fla. Stat., which relates to fiduciaries.

supplemental authority, the defendant contended further that §673.3061, Fla.
Stat., does not independently support a claim for relief (Doc. 53).

The motion was referred to me for a report and recommendation
(Doc. 64).  Subsequently, oral argument was heard on the motion.

II.

The court shall enter summary judgment only if the evidence
shows "that there is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law."  F.R.Civ.P. 56(c).
Material facts are those over which disputes "might affect the outcome of the
suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 248 (1986).  Disputes about material facts are genuine "if the evidence
is such that a reasonable jury could return a verdict for the [opposing] party."
Id.  The movant bears the burden of establishing the absence of a dispute over
material facts.  Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469
(11th Cir. 1993).

When the party moving for summary judgment has the burden of
proof at trial on a claim or contention, it must affirmatively show the absence
of a genuine issue of material fact by presenting credible evidence that would
entitle it to a directed verdict on that claim or contention if the evidence was

not controverted at trial.  United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991).  If the moving party does not meet its burden, then the motion for summary judgment will be denied.  Id. at 1437-38.  If the movant  meets its initial burden, then it is entitled to summary judgment unless the opposing party comes forward with "significant probative evidence demonstrating the existence of a triable issue of fact."  Id. at 1438.

When the party moving for summary judgment does not have the burden of proof at trial, that party may discharge its initial burden by identifying specific portions of the record which show the absence of evidence to prove the opposing party's case at trial, or, alternatively, it may come forward with "affirmative evidence demonstrating that the [opposing] party will be unable to prove its case at trial."  Id.  If this burden is not met, then the motion for summary judgment will be denied.  Id.

When the moving party meets its initial burden, the burden then shifts "to the [opposing] party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it

has the burden of proof at trial, the movant is entitled to summary judgment.
United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party.  Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469.  Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment.  Id.

III.

The defendant in its summary judgment memorandum relies primarily upon the contention that it was a holder in due course of the BBC checks.  If that is so, that status would defeat all of the plaintiff's claims.

A "holder in due course" is a holder who takes an instrument without "apparent evidence of forgery or alteration," for value, in good faith, and without notice of certain claims or defenses. §673.3021(1), Fla. Stat.  As the party claiming to be a holder in due course, the defendant has the burden to establish that it fulfilled each of these statutory requirements.  Any Kind Checks Cashed, Inc. v. Talcott, 830 So.2d 160, 164 (Fla. App. 2002);  Hobley

v. Metz, 630 So.2d 625 (Fla. App. 1994). The defendant has failed to do so with respect to the requirement of good faith.

"Good faith" is defined as honesty in fact and "the observance of reasonable commercial standards of fair dealing." §673.1031(1)(d), Fla. Stat. Prior to 1992, "good faith" was defined as "honesty in fact in the conduct of the transaction concerned." Any Kind Checks Cashed, Inc. v. Talcott, supra, 830 So.2d at 164.  However, as stated in Any Kind Checks Cashed, Inc. v. Talcott, supra, 830 So.2d at 165:

> ... in 1992, the legislature adopted a new definition of 'good faith' that applies to the section 673.3021 definition of a holder in due course: "'good faith' means honesty in fact and the observance of reasonable commercial standards of fair dealing." Ch. 92-82, §2, at 759, Laws of Fla (codified at §673.1031(1)(d)).  To the old, subjective good faith, "honesty in fact" standard, the legislature added an objective component-the pure heart of the holder must now be accompanied by reasoning that assures conduct comporting with reasonable commercial standards of fair dealing." Maine Family Fed. Credit Union v. Sun Life Assurance Co. of Canada, 727 A.2d 335, 342 (Me. 1999).  No longer may a holder of an instrument act with "a pure heart and an empty head and still obtain holder in due course status."

Therefore, a holder "'must act in a way that is fair according to commercial standards that are themselves reasonable.'"  Id. (quoting Maine

<u>Family Fed. Credit Union</u> v. <u>Sun Life Assurance Co. of Canada</u>, <u>supra</u>, 727 A.2d at 343); <u>see</u> <u>also</u> <u>State Bank of the Lakes</u> v. <u>Kansas Bankers Surety Co.</u>, 328 F.3d 906, 909 (7th Cir. 2003)(defining the standard as the "[a]voidance of advantage-taking"). Comment 4 to §673.1031, Fla. Stat., gives the following explanation of the new standard:

> Although fair dealing is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the care with which the act is performed. Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly in conducting the transactions.

In <u>Any Kind Checks Cashed, Inc.</u> v. <u>Talcott</u>, <u>supra</u>, 830 So.2d at 165-66 (quoting <u>Maine Family Fed. Credit Union</u> v. <u>Sun Life Assurance Co. of Canada</u>, <u>supra</u>, 727 A.2d at 343), the Florida court adopted the following analysis for deciding whether a holder has conducted itself in good faith:

> The factfinder must ... determine, first, whether the conduct of the holder comported with industry or 'commercial' standards applicable to the transaction and, second, whether those standards were reasonable standards intended to result in fair dealing. Each of those determinations must be made in the context of the specific transaction at hand. If the factfinder's conclusion on each point is 'yes,' the holder will be determined to have acted in good faith even if, in the individual transaction at issue, the result appears unreasonable. Thus a

holder may be accorded holder in due course status where it acts pursuant to those reasonable commercial standards of fair dealing–even if it is negligent–but may lose that status, even where it complies with commercial standards, if those standards are not reasonably related to achieving fair dealing.

As the Maine decision stated, "the ease with which the distinction between 'fair dealing' and 'careful dealing' was set forth in the comments to the U.C.C. revisions belies the difficulty in applying these concepts to the facts of any particular case, or in conveying them to a jury." Maine Family Fed. Credit Union v. Sun Life Assurance Co. of Canada, supra, 727 A.2d at 342-43. The Maine court noted further that "[t]he difficulty is exacerbated by the lack of definition of the term 'fair dealing' in the U.C.C." Id. at 343. Frankly, it is not clear to me what "reasonable commercial standards of fair dealing" look like.

Particularly in view of the uncertainty concerning the meaning of "reasonable commercial standards of fair dealing," the defendant, in order to obtain summary judgment based on its claim that it was a holder in due course, needed, among other things, to establish what those standards are and to demonstrate that its conduct met those standards. Remarkably, the defendant in its memorandum did not even mention this issue. The closest it

comes is a superficial reference to the general requirement of good faith (Doc. 31, pp. 8-9). While there was a brief mention by the defendant at the hearing regarding reasonable commercial standards of fair dealing (primarily due to my questioning), that does not suffice both because raising such an issue for the first time at oral argument is improper and because the comments at the hearing were patently inadequate to demonstrate that the defendant's conduct met "reasonable commercial standards of fair dealing."[4]

Furthermore, a review of the deposition of the defendant's expert, John Dreyer, reveals that he did not specifically address the "reasonable commercial standards of fair dealing." The plaintiff's expert, Donald Coker, did not precisely discuss that matter either, although he did refer to "banking industry standards for good faith and ordinary care" (Doc. 45, pp. 105, 108). It is doubtful that the plaintiff's expert's opinion was adequate to establish "reasonable commercial standards of fair dealing" (see id. at pp. 108-09), but

---

[4]It is noted that the defendant's argument on holder in due course prominently features three cases (Doc. 31, pp. 11-17). However, none of those cases discusses the objective component of the good faith requirement. The decision in Grand Rapids Auto Sales, Inc. v. MBNA America Bank, 227 F.Supp.2d 721, 729 (W.D. Mich. 2002), indicated that Michigan, unlike Florida, applies only the subjective component of good faith. In Hartford Accident & Indemnity Co. v. American Express Co., 544 N.Y.S.2d 153 (N.Y. App. 1989), the good faith requirement was not in dispute and therefore not addressed. Gino's of Capri, Inc. v. Chemical Bank (N.A.), 592 N.Y.S.2d 682 (N.Y. App. 1993), did not discuss the requirements of a holder in due course.

it was at least as good a presentation on the matter as the defendant's expert's, so that it would create an issue of fact if that were necessary.

In all events, the defendant has failed to address one of the requirements for being a holder in due course. Consequently, it is not entitled to summary judgment on that ground.[5]

## IV.

Although the defendant predicated its summary judgment motion primarily on the assertion that it was a holder in due course of the BBC checks, it also made brief arguments challenging the viability of each of the plaintiff's four claims (Doc. 31, pp. 18-20; Doc. 53). Despite the brevity of its arguments, the defendant has demonstrated that the plaintiff's claims of conversion, unjust enrichment and a statutory violation are meritless and should be dismissed. The claim of negligence, however, should proceed to trial.

A.  Negligence

_____

[5]The plaintiff also challenges the defendant's alleged status as a holder in due course on the ground that the plaintiff had notice that a fraud was in progress (Doc. 44, pp. 18-20). Since it has already been determined that summary judgment is not warranted based upon the defendant being a holder in due course, it is unnecessary to address this problematic issue.

Although count III of the complaint alleges a failure "to exercise ordinary care" (Doc. 2, ¶29), the plaintiff, at the summary judgment hearing and at the pretrial conference, avoids calling that claim one for negligence. Rather, it asserts that it is relying upon Judge Posner's opinion in <u>Travelers Casualty & Surety Co. of America</u> v. <u>Wells Fargo Bank, N.A.</u>, 374 F.3d 521 (7th Cir. 2004), and, purportedly in accordance with that decision, the plaintiff is labeling its claim as one alleging "an absolute duty of inquiry" (Doc. 49, p. 3).

The <u>Travelers</u> decision involved a forged check of $287,651.23 that was deposited with the securities brokerage firm of Charles Schwab and subsequently paid out to the malefactor.  The Seventh Circuit applied to Schwab the rule that requires a bank who receives a check made out to it by a drawer that owes the bank no money to exercise due care to make sure that the drawer intended the depositor to receive the drawer's money.  <u>Id</u>. at 525.[6] The <u>Travelers</u> decision recognized that the imposition of that duty upon banks is unusual because it creates a form of "good samaritan" liability, but the court said that the rule was firmly established.  <u>Id</u>. at 527.  Moreover, it concluded

---

[6]Notably, contrary to the plaintiff's labeling of its claim, Judge Posner did not use the word "absolute" in the decision.

that "the common law duty should extend to enterprises such as Schwab that offer a checking service in competition with banks." Id. at 526.

The plaintiff does not argue that the duty of inquiry extends to the million checks per day that are electronically processed by the defendant. However, it does apparently assert that every check that is manually handled is subject to that duty. The plaintiff does not set forth any policy reasons for that assertion. Instead, it simply contends that Travelers covers this situation.

But Travelers is clearly distinguishable. Travelers, as indicated, was based on the view that the bank deposit rule should be extended to brokerage firms because, like banks, they offer a checking service. There is no evidence that the defendant offers a comparable service.

In contrast to the plaintiff's position that there is a duty of inquiry with respect to all of the checks that are manually handled, the defendant takes the other extreme, saying that there is no duty with respect to any of them. In support of this contention, the defendant relies upon Grand Rapid Auto Sales, Inc. v. MBNA America Bank, 227 F.Supp.2d 721 (W.D. Mich. 2002), which held that a credit card company owed no duty of inquiry to the drawer of misapplied checks. That case, however, is also distinguishable because it dealt with checks that were handled electronically by high-speed processing.

As indicated, the plaintiff acknowledges there is no duty of inquiry in that circumstance.

Neither side's authority, therefore, is apposite.  Moreover, neither party has provided a cogent reason for rejecting the venerable standard of reasonable care in favor of its approach.

The plaintiff, in fact, has not attempted to justify its proposed standard of absolute duty of inquiry, but has simply cited Travelers for its position.  That decision is distinguishable not only because it involved the bank deposit rule (as extended), but also because it involved a single large check.  In this case, the defendant asserts, without dispute, that approximately 2.5 million payments per year require manual handling (Doc. 31, p. 5).  Many of these are handled manually merely because, for example, there was no payment coupon enclosed, or it was not in the envelope that had been provided (Doc. 47, Ex. A, Citi 315-16).  There is plainly nothing about these types of circumstances that would raise significant questions about the validity of the checks.  Consequently, it would be completely unreasonable to impose a duty upon the defendant to make inquiry of the drawer of every check that is manually handled.

On the other hand, there also seems to be no justification for the defendant's contention that it never has a duty of inquiry regardless of what circumstances appear with respect to a manually-handled check. In the first place, the defendant, contrary to its contention, is not really in the position of a good samaritan. Rather, it is taking the drawer's funds and keeping them. This relationship, it seems to me, would warrant a duty of inquiry in appropriate circumstances.

Furthermore, the defendant _does_ make inquiry in appropriate circumstances. Thus, the defendant has a procedure for fraud detection. In connection with this procedure, the payment processor reviews the check in accordance with fraud review criteria (Doc. 46, Ex. A). If certain fraud indicators appear, then the check is referred to a different section for further consideration. In this case, for example, the initial BBC check was referred to the fraud review section and a telephone call was made to the drawer's bank to confirm that the drawer's account had sufficient funds to cover the check. Since the defendant could make the effort to protect its own interest, it plainly could make the effort to protect the drawer's interest. See Travelers Casualty & Surety Co. of America v. Wells Fargo Bank, N.A., supra, 374 F.3d at 527. The defendant's own procedures therefore show that it would not be unduly

burdensome to impose upon the defendant a duty to inquire in some circumstances.

Having rejected the polar positions taken by the parties, the natural consequence is the adoption of the classic standard of reasonable care under the circumstances. It is this standard, moreover, which count III of the complaint alleges was violated. Thus, count III alleges that "Citibank failed to exercise ordinary care in its business practices for its acceptance of the checks in one or more of the [specified] ways" (Doc. 2, ¶29).

Importantly, although the plaintiff alleged in the complaint that the defendant was negligent in certain respects, the defendant in its summary judgment memorandum did not discuss any of those allegations in the one-half page it devoted to the negligence claim (Doc. 31, p. 19). The conclusory assertion that "there is no evidence in the record that Citibank breached any duty by accepting authentic negotiable instruments as payment of a debt" (id.) is not sufficient to raise a factual issue that requires a response from the plaintiff. See Handeen v. Lemaire, 112 F.3d 1339, 1346-47 (8th Cir. 1997).

In any event, the record does contain evidence of circumstances that a jury could reasonably find created a duty on the defendant's part to make inquiry of BBC about the validity of the checks. These circumstances

include: (1) there was no payment coupon; (2) the credit card account number was handwritten on the check stub; (3) the payee was not Citibank (or some variation), but AT&T (or some variation); (4) BBC, the drawer, did not have an account with the defendant; (5) most of the checks were for more than $1,000 (which is significant under the defendant's fraud review criteria) and many were in the range of $4,000 to $5,000; (6) the checks were not for the account balance (or the minimum payment); (7) on some days more than one check was credited to a Rodriguez account; and (8) on one occasion, five checks were received on the same day and it appears that at least four of those (in the amounts of $8,464, $4,539.67, $2,810.34, and $4,166.29) were handled and initialed by the same person (see Doc. 29, Ex. 4, pp. 507-16).

Of course, a trial could yield countervailing circumstances, such as BBC's failure over a period of months to raise any issue about the validity of the checks, thereby permitting the defendant to assume that the payments did not involve any irregularities. Nevertheless, at this point, when the enumerated circumstances, and any inference they generate, are viewed in the plaintiff's favor, there clearly is a jury question whether the defendant breached a duty to contact BBC about the checks. Therefore, the summary judgment motion should be denied with respect to the claim of negligence.

B.  <u>Unjust enrichment</u>.

The defendant also argues that the plaintiff's unjust enrichment claim is not actionable (Doc. 31, pp. 19-20).  In this connection, the plaintiff claims that "BBC received no benefit from Citibank's wrongful acceptance of the checks, and, under the circumstances, it would be inequitable for Citibank to retain the benefits conferred to it by BBC" (Doc. 2, ¶19).  The plaintiff further alleges that it "has no adequate remedy under the law" (<u>id</u>. at ¶20).

The elements of a cause of action for unjust enrichment are:  (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.  <u>Commerce Partnership 8098 Ltd. Partnership</u> v. <u>Equity Contracting Co., Inc.</u>, 695 So.2d 383, 386 (Fla. App. 1997).  Importantly, "an unjust enrichment cannot exist 'where payment has been made for the benefit conferred.'" <u>Id</u>. at  388.

The defendant has persuasively argued that this claim is not cognizable because it "did not accept the checks 'without paying for it'"(Doc. 31, p. 20).  It adds that "[i]t is undisputed that Citibank extended more than

$120,000 in credit pursuant to the terms of the AT&T Universal Card account agreement" (id.).

Accordingly, the defendant is not liable under a theory of unjust enrichment because it "can be liable only where it received a windfall benefit, something for nothing." Commerce Partnership 8098 Ltd. Partnership v. Equity Contracting Co., Inc., supra, 695 So.2d at 389; Gene B. Glick Co., Inc. v. Sunshine Ready Concrete Co., Inc., 651 So.2d 190 (Fla. App. 1995) ("Unjust enrichment is equitable in nature and cannot exist where payment has been made for the benefit conferred"). Here, the defendant clearly did not receive something for nothing because the proceeds of the checks were credited toward the debt accumulated on two credit card accounts. Therefore, summary judgment for the defendant is warranted on count I of the complaint.

C. Conversion.

The defendant, in addition, moves for summary judgment on the plaintiff's claim that "Citibank converted BBC's property by wrongfully accepting and subsequently negotiating the checks" (Doc. 2, ¶23). Under Florida law, a conversion is "an unauthorized act which deprives another of his property permanently or for an indefinite time." Fogade v. ENB Revocable Trust, 263 F.3d 1274, 1291 (11th Cir. 2001)(quoting Senfeld v.

Bank of Nova Scotia Trust Co. (Cayman) Ltd., 450 So.2d 1157, 1160-61 (Fla. App. 1984)).

However, the plaintiff's conversion claim fails as a matter of law. The drawer of a check may not maintain an action for conversion because the checks represent an obligation of the drawer rather than the property of the drawer.  Conder v. Union Planters Bank, N.A., 384 F.3d 397, 399 (7th Cir. 2004);  Grand Rapids Auto Sales, Inc. v. MBNA America Bank, supra, 227 F.Supp.2d at 730.   Accordingly, the plaintiff conceded at the summary judgment hearing that the conversion claim was not viable.   Therefore, summary judgment should be granted for the defendant on count II of the complaint.

D.  Statutory violation.

Finally, the plaintiff weakly asserts a statutory claim under §673.3061, Fla. Stat.   However, as the defendant persuasively argues, this statutory provision has not been shown by the plaintiff to support a claim for relief (Doc. 53, pp. 2-3).

Section 673.3061, Fla. Stat., states:

> A person taking an instrument, other than a person
> having rights of a holder in due course, is subject to
> a claim of a property or possessory right in the

> instrument or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds. A person having rights of a holder in due course takes free of the claim to the instrument.

That provision simply sets forth the general rule that a holder in due course takes an instrument free of claims, while one who is not a holder in due course takes an instrument subject to claims. The provision does not set forth any elements of a claim or specify a remedy. Thus, a party that is suing a party that is not a holder in due course must have an actionable claim apart from §673.3061; §673.3061 does not give him one, but merely exposes the holder to an actionable claim. In short, the provision does not create an actionable claim.

The defendant, moreover, was able to cite some authority in support of its contention that §673.3061 does not support a claim for relief. See In re World Metals, Inc., 313 B.R. 720, 729 (Bank. N.D. Ohio, 2004); Chouteau Auto Mart, Inc. v. First Bank of Missouri, 148 S.W.3d 17, 21-22 (Mo. App. 2004). In contrast, the plaintiff has not cited any authority supporting its contention that this statute provides an independent claim for relief. Moreover, the plaintiff has not stated any meaningful argument on this issue either in response to the defendant's supplemental authority or at oral

argument.  Therefore, under these circumstances, it is appropriate to grant summary judgment in the defendant's favor on the plaintiff's claim in count IV.

V.

For the foregoing reasons, I recommend that the defendant be granted summary judgment on the plaintiff's claims of unjust enrichment, conversion, and the alleged violation of §673.3061.  However, because the defendant has failed to demonstrate that it is a holder in due course of the checks at issue in this matter, or that it is entitled to summary judgment on the negligence claim, the motion should be denied as to that claim.

Respectfully submitted,

DATED: SEPT. 29, 2005

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).